UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> ) <br> ) <br> v.                                    ) <br> ) <br> ) <br> SHANE DOYLE,                       ) <br> ) <br>             Defendant               ) <br> ) <br> ) | Docket No. 09-CR-10035-DPW |

### DEFENDANT SHANE DOYLE'S SENTENCING MEMORANDUM

Defendant Shane Doyle, by and through his undersigned counsel, submits this sentencing memorandum in connection with his sentencing, currently scheduled for January 14, 2009.

Mr. Doyle respectfully requests that this court impose a sentence of two years probation.[1] Probation is appropriate in this case because Mr. Doyle has accepted full responsibility for his conduct and has rendered extraordinary substantial assistance to the government in connection with its investigation and ensuing indictment of Mr. Doyle's former employer, Stryker Biotech, and four of Stryker's executives. Moreover, a sentence of probation will allow Mr. Doyle to continue his employment at ETEX Corporation, and to care and provide for his young and growing family. For these reasons, which are discussed more fully below, a sentence of probation is warranted.

---

[1] Mr. Doyle recognizes that the plea agreement in this case limits his ability to request a departure from the Sentencing Guidelines or for a sentence outside the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a). The Court, however, retains discretion to impose a sentence sufficient, but not greater than necessary, after considering the factors set forth in 18 U.S.C. § 3553(a). Mr. Doyle therefore, brings all of the § 3553(a) factors to the Court's attention for such use as the Court deems appropriate.

I.  BACKGROUND

Shane Doyle has no prior contact with the criminal justice system. PSR ¶ 34-39. He has been married for approximately six and a half years to his wife Sarah. PSR ¶ 47. He is the father of two very young children; a twenty-one month old son Finn, and a newborn daughter Molly (she was born on November 19, 2009). PSR ¶ 47, see also Letter of Sarah Doyle.[2]

Mr. Doyle is thirty three years old. PSR ¶ 40. He is the oldest of two boys, and was born and raised in the Northborough and Southborough area of Massachusetts. PSR ¶ 40. His parents owned and operated a company which provided training for individuals seeking to become licensed insurance agents. PSR ¶ 44-45. Mr. Doyle's childhood was stable and happy. PSR ¶ 41. He enjoyed playing sports and vacationing with his family. PSR ¶ 43. Mr. Doyle also contributed to his community; he participated in town clean up week in Southborough every year throughout high school, captained his football, baseball and basketball teams and was an active member of the National Honor Society. See Letter of Patricia Doyle.

After graduating from high school in 1994, Mr. Doyle attended Wesleyan University in Connecticut, where he earned a Bachelor of Arts degree in neuroscience and behavior in 1994. PSR ¶ 56. Notably, Mr. Doyle received an athletic department award which honored him as the student who best represented the school's ideals of balance between academics, athletics, school and community service. See Letter of Dennis Doyle. Following graduation, Mr. Doyle worked at the Cardiovascular Data Analysis Center – which is currently part of the Harvard Clinical Research Institute – for approximately a year and a half. PSR ¶ 60.

---

[2] Letters regarding Doyle's character written by his family and his employer, including his wife Sarah's letter, are attached as Tab A.

Mr. Doyle left that position to pursue an opportunity with Stryker Biotech ("Stryker"),[3] where he remained employed for approximately eight years. PSR ¶ 59. Mr. Doyle began his career at Stryker Biotech's headquarters in Hopkinton, Massachusetts as a marketing associate, and was promoted to the position of Trauma Product Manager in January of 2001. PSR ¶ 59. In July of 2002, Mr. Doyle transitioned to a sales position – as Territory Manager (i.e., sales representative) primarily responsible for Arizona and New Mexico – at which he worked until he resigned in September of 2007. PSR ¶ 59. During his time at Stryker – which subsumed most of Mr. Doyle's young professional career – he received intense pressure to increase sales from Stryker's misguided leadership. See Letter of Sarah Doyle. In fact, both Stryker and its senior management, including both Mr. Doyle's direct regional sales manager and the director of sales, have subsequently been indicted for their sales practices. See Tab B, Indictment, *United States v. Stryker Biotech, LLC et al.*

Since resigning from Stryker, Mr. Doyle and his young family have returned home to Massachusetts, and he is currently employed by ETEX Corporation ("ETEX") as a marketing manager.[4] PSR ¶¶ 40, 50, 58. As attested to by ETEX's President and CEO, Mr. Doyle informed the company of both his improper conduct while employed at Stryker, as well as the resulting charges brought against him, in a "forthright manner." See Letter of Brian T. Ennis, citing Mr. Doyle's significant contributions to ETEX and, most especially his "character, integrity, skill and work ethic." ETEX has elected to retain Mr. Doyle as a valued employee. Id.; PSR ¶ 58. Indeed, ETEX has expressly stated that it is prepared to promote Mr. Doyle within the company when the opportunity presents itself. See Letter of Brian T. Ennis.

---

[3] Stryker Biotech is referred to as XYZ Company in the PSR.
[4] ETEC Corporation develops, manufactures and markets biomaterials that promote the regeneration of bone damaged by trauma or disease. Mr. Doyle's duties and responsibilities focus on the launch of new devices as well as the development of a multi-product marketing plan for ETEX Corporation.

## II. OFFENSE CONDUCT

The conduct underlying Mr. Doyle's guilty plea is described below. As a prologue to that description, however, it is appropriate to first reference the mature and reflective way Mr. Doyle has fully accepted responsibility for that offense conduct. No better evidence exists than in the letters of those closest to him – his wife and his parents – and their perspectives are worthy of note. Shane's wife, Sarah Doyle, writes, "While I tried to get to the root of the issue, trying to wrap my mind around the negative culture in which Shane worked, the misguided leadership that Shane unfortunately followed, Shane consistently stated things like, 'It's my fault' or 'It was a bad choice that I made." See Letter of Mrs. Sarah M. Doyle. Shane's mother's sentiments echoes his wife's, " Shane regrets having done what he did and tells me he should have thought it through far more thoroughly at the time. I do not know much about business and do not completely understand this circumstance, although [Shane] tells me he was wrong." See Letter of Mrs. Patricia B. Doyle. Shane's father adds, "This poor decision that brings him before you today would seem to be an aberration. One that he fully acknowledges and will never forget." See Letter of Mr. Dennis M. Doyle.

Mr. Doyle not only accepted responsibility for the below conduct, he also agreed to resolve separate and distinct conduct through a civil settlement. See Exhibit B to the Plea Agreement. Mr. Doyle chose to enter into the civil settlement to avoid protracted and unnecessary legal wrangling. Mr. Doyle has already paid $75,000 to the United States in connection with the civil settlement agreement despite the financial hardship it has cost his family.

Stryker manufactures and sells medical devices for the use in healing of fractured or broken bones including: (1) OP-1 Implant, a device to promote growth in certain long bone non-

unions;[5] (2) OP-1 Putty, a device to promote bone grown in certain spinal fusions;[6] and (3) Calstrux, a bone void filler for bone defects.[7] PSR ¶ 9. OP-1 Implant and Putty were approved by the FDA via a Humanitarian Device Exemption ("HDE") which can only be granted upon a finding that the device was designed to treat a condition affecting less than 4,000 individuals in the United States. PSR ¶¶ 10, 12. The devices were not approved for use in conjunction with one another. PSR ¶ 13. Mr. Doyle admits that, as a sales representative, he marketed the OP-1 Putty and the Calstrux for use together despite the fact that he knew that the products were not approved for conjunctive use. The cost of the devices to be used together exceeded $10,000 (the OP-1 Putty typically was sold for $5,000 or $5,250 and the Calstrux was typically sold for $750) but was less than $30,000, as Mr. Doyle admitted to selling the devices for use together on two occasions. PSR ¶ 15 n. 5; see U.S.S.G. § 2B1.1.

Mr. Doyle agrees that the total offense level reflected in the final pre-sentence investigation report – i.e., 12 – is properly calculated before taking into account any reduction for the substantial assistance Mr. Doyle has rendered to the government.[8] However, Mr. Doyle's assistance to the government in their investigation and prosecution of Stryker has indeed been substantial. Accordingly, his final offense level should be reduced to produce a sentence that fairly reflects Mr. Doyle's full acceptance of responsibility and his extraordinary assistance to the government. Such a sentence is two years of probation.

---

[5] OP-1 Implant is referred to as Device A in the PSR.
[6] OP-1 Putty is referred to as Device B in the PSR.
[7] Calstrux is referred to as Device C in the PSR.
[8] The government has yet to file its sentencing memorandum. Doyle reserves the right to supplement his sentencing memorandum should the government file any objections.

### III. DOYLE PROVIDED SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT IN CONNECTION WITH ITS INVESTIGATION OF STRYKER BIOTECH AND VARIOUS INDIVIDUALS

As of this writing, the government has not filed a 5K1.1 motion. Nevertheless, even if the government does not file such a motion, Mr. Doyle's extraordinary cooperation is properly considered by the Court when determining the appropriate sentence. *See* 18 U.S.C. § 3553(a)(1) (court should consider the history and characteristics of defendant when determining the appropriate sentence); *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (court may consider defendant's efforts to cooperate with government in determining appropriate sentence even if the government did not file a 5K1.1 motion). In the alternative, if the government does file a 5K1.1 motion, the Court must consider the nature and extent of Mr. Doyle's cooperation in determining the appropriate departure under the guidelines. *See* USSG § 5K1.1(a). Regardless of whether the Court considers Mr. Doyle's cooperation in the 5K1.1 context, or as a relevant factor under 18 U.S.C. § 3553(a), his extraordinary cooperation weighs in favor of a probationary sentence.

Both prior to and since pleading guilty, Mr. Doyle has made every effort to cooperate with the U.S. Attorney's Office in the related investigation of Stryker Biotech and various employees, including current and former executives. In September of 2008, months before he was formally charged, Mr. Doyle instructed his counsel to meet with the government and share information related to the offense. Moreover, Mr. Doyle provided documents to the government throughout the fall of 2008 and in early 2009. In fact, Mr. Doyle provided the government with over 8,000 pages of relevant documents and copies of cds and dvds which he had obtained from Stryker in the course of his employment. The government has repeatedly requested multiple copies and/or originals of many of the documents provided by Mr. Doyle which both

underscores the importance of that documentation to the investigation, and establishes that Mr. Doyle is the original source. Further still, Mr. Doyle has been interviewed by the U.S. Attorney's Office on multiple occasions, both before and after his guilty plea was entered, and he has testified in front of the grand jury. It is beyond dispute that Mr. Doyle has not only made himself available to the government at every juncture, but that he has also brought his insight – along with his memory and his documents – to each session. Finally, Mr. Doyle is committed to continuing his cooperation with the government and has resolved to testify at the trial of the company and its senior management, currently scheduled for the summer of 2010.

In his cooperation sessions, Mr. Doyle provided the government with an insider's view as to how Stryker Biotech promoted the conjoined marketing of the two devices (i.e., OP-1 Putty and Calstrux), as well as how Stryker pressured its sales representatives, including Mr. Doyle, to engage in unlawful marketing tactics. Because of his seven plus year tenure at Stryker, and his varied roles within the company, Mr. Doyle has been instrumental in providing the government with information as to how Stryker conducted business both across time and throughout its hierarchy.

Mr. Doyle's cooperation has led to Stryker Biotech being indicted by the government. *See* Tab B, Indictment, *United States v. Stryker Biotech, LLC et al.* Mr. Doyle's cooperation has also led to criminal charges being brought against Mark Philip, the President of Stryker Biotech from approximately April 2004 through approximately February 2008; Bill Heppner, an executive who managed the sales force under various titles including National Sales Director; David Ard, Mr. Doyle's direct supervisor and the Regional Manager for the West Region of Stryker Biotech; and Jeffrey Whitaker, the Regional Manager for the Southeast Region. *See* Tab B, Indictment, *United States v. Stryker Biotech, LLC et al.*

In short, Mr. Doyle has done everything the government has asked – both before and since pleading guilty – and he has provided the government with critical information that has led to criminal prosecutions. Moreover, as noted above, Mr. Doyle is committed to continuing his cooperation; the government has indicated that a trial is anticipated this summer, and Mr. Doyle has committed to testifying at that trial. Thus, in light of the totality of Mr. Doyle's extensive and continuing cooperation, as well as his full acceptance of responsibility, a sentence of probation is appropriate and warranted.

## IV.    18 U.S.C. § 3553(A) FACTORS

In crafting the appropriate sentence, the Court is required to consider the nature and circumstances of the offense and characteristics of the defendant and impose a sentence that is ***sufficient, but not greater than necessary***, to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocation training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a) (emphasis added).

While Mr. Doyle should be punished for his role in this offense and takes full responsibility for his actions, an appropriate sentence in this case should also reflect: A) Stryker's encouragement of Mr. Doyle's sales activity; B) Mr. Doyle's conduct compared to others who engaged in similar behavior; C) Mr. Doyle's extraordinary assistance rendered to the government in connection with the investigation of misbranding and related issues at Stryker; and D) Mr. Doyle's personal characteristics.

### A. Stryker's Support of Mr. Doyle's Sales Activity

As evidenced in the indictments of Stryker and its top executives, the company and its management team encouraged, supported and essentially required illegal activity by its sales representatives, including Mr. Doyle. The indictments confirm that Stryker has a long history of both condoning and encouraging off label marketing by its sales force. In fact, the focus on sales without regard to regulation was so pervasive as to create an atmosphere in which such conduct was the norm and, seemingly, acceptable.

When Mr. Doyle first started as a Territory Manager, he was only responsible for selling OP-1 Implant. As noted, OP-1 Implant was approved by the FDA under the Humanitarian Device Excemption ("HDE"). PSR ¶ 10. An HDE device does not have to demonstrate efficacy and can only be granted upon a finding by the FDA that the device was designed to treat or diagnose a disease or condition that affects fewer than 4,000 individuals in the United States. PSR ¶ 12. Additionally, an HDE device could only be used at a medical facility after an Institutional Review Board ("IRB"), acting at or on behalf of that medical facility, approved the use of the device for the FDA approved indication. PSR ¶ 12. Stryker trained Mr. Doyle and others to "facilitate" the IRB process by completing the paperwork, attending the meeting and otherwise "controlling" the process. Additionally, Stryker paid no heed to the limited approval for the device and in fact encouraged its sales force, including Mr. Doyle, to inform the surgeon to use the device as he or she saw fit.

In 2004, Stryker received an additional HDE approval for OP-1 Putty, for use in specific spinal surgeries, as well as approval pursuant to 510(k), which provides approval for a device that is determined to be "substantially equivalent" to a legally marketed device, for a bone void filler product called Calstrux. PSR ¶ 10-12. Stryker intended Calstrux to be mixed with OP-1

products as a "carrier" or "extender" to increase the volume and handling characteristics of the OP-1 despite the fact that it did not (1) conduct any studies of the devices together; (2) apply to the FDA for approval to mix the devices; or (3) formulate approved directions for use of the devices together. Mr. Doyle initially did not sell the Calstrux for over a year. Stryker and his supervisors, however, made it clear to Mr. Doyle that he was expected to sell the Calstrux and that he could sell it as a handling agent for the OP-1. Mr. Doyle's direct manager, David Ard, discussed mixing of the two devices, and even provided Mr. Doyle with a "recipe" for such mixing. Indeed, Mr. Ard encouraged the sale of the two devices in conjunction with a single sales pitch. Moreover, recipes and sales techniques for selling the devices to be used concurrently were discussed at Stryker meetings attended by senior management.

### B.    Mr. Doyle's Conduct Compared to Others

Mr. Doyle is not the sole Stryker sales representative who engaged in misbranding. At the time of this writing, three other former Stryker sales representatives, Darnell Martin, Justin Demming and Christopher Ring, have also pled guilty to misbranding charges. *See United States v. Martin*, 08-CR-10338-WGY (plea accepted on November 19, 2008; sentencing currently scheduled for April 7, 2010); *United States v. Demming*, 08-CR-10379-NG (plea accepted on February 10, 2009; sentencing currently scheduled for April 2010); United and *United States v. Ring*, 09-CR-10096-MLW (plea accepted on May 8, 2009; sentencing currently scheduled for January 2010 pending motion to continue to April 2010). Based upon information and belief, each of Mr. Doyle's colleagues is also cooperating with the government. *See United States v. Martin*, 08-CR-10338-WGY, plea agreement; *United States v. Demming*, 08-CR-10379-NG, plea agreement; United and *United States v. Ring*, 09-CR-10096-MLW, plea agreement. In crafting the appropriate sentence in this case, the Court should not only consider sentences in other

misbranding cases discussed *infra* at pages 12-13 but also the potential sentences to be imposed on Mr. Doyle's colleagues. *See U.S. v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) (sentencing court has "discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system"); *see also U.S. v. Rodriguez*, 527 F.3d 221, 229 (1st Cir. 2008) (codefendants' sentences are validly considered under the totality of the § 3553(a) subparts). While Mr. Doyle's colleagues will all be sentenced after Mr. Doyle, the Court should recognize that Mr. Doyle's behavior was not internally aberrant, and that three of his colleagues will be sentenced for similar violations. Indeed, the majority of the sales force – if not the entire sales force – could likely be indicted for misbranding violations. Additionally, the company itself (Stryker Biotech), along with members of its management team – including Doyle's direct supervisor, Regional Manager for the West Region David Ard; and Regional Manager for the Southeast Region, Jeffrey Whitaker – were specifically indicted for distribution of a misbranded device. *See* Tab B, Indictment, *United States v. Stryker Biotech, LLC et al.* Thus, any sentence imposed on Mr. Doyle should take into account the indictment of the company – as well as Mr. Doyle's direct supervisor and other superiors – for the same behavior. In light of Stryker's encouragement – indeed, its requirement – of unlawful activity, Mr. Doyle's sentence should properly reflect his more subordinate position as a sales representative, whose situation and conduct mirrored that of his peers.

An appropriate sentence in this case should also reflect the fact that Mr. Doyle's conduct compares favorably to others who engaged in far more extensive and egregious misbranding conduct, but who were either not prosecuted criminally or were prosecuted for misdemeanors rather than felonies. *See U.S. v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) (18 U.S.C. § 3553(a)(6)

aims at the minimization of disparities among defendants' sentences nationally). Upon information and belief, other Stryker sales representatives engaged in similar conduct and were not targeted by the government for prosecution.[9] Additionally, a sampling of other misbranding prosecutions reveals that probation is an appropriate sentence.

- *United States v. Holloway*, 09-CR-10089 (D. Mass): Mary Holloway, a Pharmco regional manager of approximately 1000 sales representatives, received a two year probationary sentence after pleading guilty to one count of distribution of a misbranded drug (misdemeanor). Holloway promoted and caused the promotion of a drug, Bextra, for unapproved uses and dosages, despite knowing that the FDA had raised specific safety concerns about the use of Bextra for some of those same unapproved uses.

- *United States v. Muurahainen,* 08-CR-10182 (D. Mass): Dr. Norma Muurahainen, Medical Director within Medical Affairs for Serono Inc., pled guilty to a three misdemeanor counts of having caused the introduction into interstate commerce of adulterated medical devices by providing advice, guidance and support to the Medical Affairs Unit as well as to the sales force causing the dissemination of such devices. She received a probationary sentence of one year.

- *United States v. Rodgers*, 00-CR-10118 (D. Mass. 2000): Rodgers, Chairman of the Board of Private Biologicals Corporation, was convicted of three counts misdemeanor misbranding. He was sentenced to a one year term of probation and a 10,000 fine.

- *United States v. Bryan Corp.*, 07-CR-10353 (D. Mass. 2007): Defendant Corporation pled guilty to two counts of misdemeanor misbranding and one count of obstruction of justice in connection with the off label promotion of Product 1690. Corporation was sentenced to one year of probation and was fined approximately 4.5 million.

- *United States v. Purdue Frederick Co. et al.,* 07-CR-00029 (W. D. Va. 2007): The company's senior executives; Michael Friedman, President and CEO; Howard Udell, Chief Legal Officer; and Paul Goldenheim, Chief Scientific Officer, all pled guilty to misdemeanor misbranding charges for the off label promotion of OxyContin. All three received probationary term of three years including 400 hours of community service as sentences.

---

[9] The United States has also chosen to resolve claims of off label promotion against certain companies civilly rather than through criminal prosecutions. See e.g. "Otsuka to Pay More than $4 Million to Resolve Off Label Marketing Allegations Involving Abilify" at http://www.justice.gov/usao/ma/Press%20Office%20-%20Press%20Release%20Files/Mar2008/OtsukaSettlementPR.html.

- *United States v. Norian Corp. et. al.,* 09-00403 (E.D. Pa. 2009): Four senior executives pled guilty to misbranding misdemeanors related to conducting clinical trials without permission from the FDA. Allegedly at least three patients died during the clinical trials. All four are awaiting sentencing.

- *United States v. Jeffrey Lund,* 09-CR-00037 (S.D. Ohio 2009): Mr. Lundy pled guilty to one count felony misbranding for introducing or delivering certain drugs into interstate commerce that were misbranded because their labels contained inadequate directions for use and bore inadequate warnings against use, and they were manufactured in an establishment not authorized by the FDA. Mr. Lund was sentenced to three years of probation with a four month period of home confinement and was not assessed any fines.

- *United States v. Duford,* 04-CR-00033 (S.D. Ohio 2004): Mr. Duford pled guilty to a felony misbranding charge. He received a sentence of one year non-supervised probation and two counts of smuggling goods into the United States were dismissed.

### C.  Mr. Doyle's Substantial Assistance Rendered to The Government

Any sentence imposed in this case should likewise take into account Mr. Doyle's substantial assistance rendered to the government in connection with its investigation of Stryker Biotech and its executives. As of this writing, the government has not filed a 5K1.1 motion. Nevertheless, even if the government does not file such a motion, Mr. Doyle's extraordinary cooperation is properly considered by the Court when determining the appropriate sentence. *See* 18 U.S.C. § 3553(a)(1) (court should consider history and characteristics of defendant when determining appropriate sentence); *United States v. Fernandez,* 443 F.3d 19, 33 (2d Cir. 2006) (court may consider defendant's efforts to cooperate with government in determining appropriate sentence even if the government did not file 5K1.1 motion).

In the alternative, if the government does file a 5K1.1 motion, the Court must consider the nature and extent of Mr. Doyle's cooperation in determining the appropriate departure under the guidelines. *See* U.S.S.G. § 5K1.1(a). Whether the Court considers Mr. Doyle's cooperation

in the 5K1.1 context or as a relevant factor under 18 U.S.C. § 3553(a), his extraordinary cooperation weighs in favor of the Court departing downward from the guideline range recommended by Mr. Doyle's Pre-Sentence Report.

Mr. Doyle's extensive cooperation has already been discussed *infra* at pages 6-8. In sum, Mr. Doyle has done everything the government has asked since he pled guilty and has provided the government with critical information that has led to criminal prosecutions. Furthermore, Mr. Doyle has committed to further cooperation with the government. Thus, any sentence imposed by the Court should reflect this extensive, invaluable and ongoing cooperation.

### D.    Characteristics of Defendant

Any sentence imposed by the Court should also reflect the characteristics of the defendant. Mr. Doyle is a non-violent first time offender who engaged in a practice that was widespread in the healthcare industry, generally, and was the normative practice within Stryker Biotech, where Mr. Doyle began working just one and a half years out of college and essentially comprised the totality of his professional experience. He was young, impressionable and led by Stryker's culture and tactics to accept that the governing regulations were arcane and universally ignored. Indeed, it was easy to be lulled into that false sense of security when the conduct at issue was encouraged by his superiors and engaged in by his peers. In the words of the CEO of his current employer – who has seen fit to continue Mr. Doyle's employment, praise his integrity and as work ethic, and consider him for advancement – Mr. Doyle's actions were those of "an inexperienced young man succumbing to extraordinary business pressure". See Letter of Brian Ennis.

Mr. Doyle no longer works in sales but does focus on the marketing side of the business. PSR ¶ 58. In that regard, he works closely with both the legal and regulatory

departments at ETEX to ensure that all promotion is on label and within the four corners of the law. As his current employer noted, "Mr. Doyle has conducted himself in a professional and highly ethical manner at all times during his employment". See Letter of Brian Ennis. Moreover, Mr. Doyle's transgression was completely "out of character." See Letters of Brian Ennis, Sarah Doyle, Dennis Doyle and Patricia Doyle. It is clear – from his frank acceptance of responsibility, his forthrightness in disclosing his conduct to his current employer, and in his substantial assistance to the government – that Mr. Doyle has learned a very hard lesson. Accordingly, the sentence imposed need not reflect the need to deter Mr. Doyle from such conduct in the future, rehabilitate him, or protect the public from him, because clearly there is no reasonable risk that he will re-offend.

Finally, Mr. Doyle is a father of two small children and is productively employed at ETEX Corporation as a marketing manager. He is his family's sole wage earner, now that Mr. Doyle's wife, a former teacher, stays at home to care for their two young children. As such, Mr. Doyle's family requires the financial support that his gainful employment provides. A reasonable sentence, meeting all the criteria set forth in 18 U.S.C. § 3553(a), would allow Mr. Doyle to continue to both financially support his family and be the productive member of society that he has surely demonstrated he now is. A sentence of probation justly and appropriately achieves that purpose.

## IV. CONCLUSION

For the foregoing reasons, Mr. Doyle respectfully requests that this Court impose a sentence that is sufficient but not greater than necessary to satisfy the factors set forth in 18 U.S.C. § 3553(a).

                                        Respectfully submitted,

                                        /s/ Jennifer M. Ryan
                                        Paul R. Cirel (BBO #)
                                        Jennifer M. Ryan (BBO # 661498)
                                        DWYER & COLLORA, LLP
                                        600 Atlantic Avenue
                                        Boston, MA 02210
                                        (617) 371-1000
                                        (617) 371-1037 (Facsimile)

Dated: December 24, 2009

## CERTIFICATE OF SERVICE

I, Jennifer M. Ryan, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on December 24, 2009.

                                        /s/ Jennifer M. Ryan
                                        Jennifer M. Ryan