```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS



 UNITED STATES OF AMERICA        )
                                 )
                                 )
 vs.                             )
                                 )  No. 1:09-cr-10035-DPW-1
                                 )
 SHANE DOYLE,                    )
                                 )
              Defendant.         )



 BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK



              DAY ONE OF SENTENCING HEARING




      John Joseph Moakley United States Courthouse
                    Courtroom No. 1
                   One Courthouse Way
                    Boston, MA 02210
                 Monday, March 19, 2012
                       2:30 p.m.




              Brenda K. Hancock, RMR, CRR
                 Official Court Reporter
      John Joseph Moakley United States Courthouse
                   One Courthouse Way
                    Boston, MA 02210
                     (617)439-3214
```

```
 1   APPEARANCES:

 2        UNITED STATES ATTORNEY'S OFFICE
          By:  Jeremy M. Sternberg, Esq.
 3        1 Courthouse Way, Suite 9200
          Boston, MA 02210
 4        On behalf of the United States of America.

 5        COLLORA LLP
          By:  Paul R. Cirel, Esq.
 6             Ingrid S. Martin, Esq.
          600 Atlantic Avenue
 7        Suite 1200
          Boston, MA 02210
 8        On behalf of the Defendant.

 9

10   ALSO PRESENT:

11   UNITED STATES PROBATION:  USPO Martha Victoria

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (The following proceedings were held in open court
2     before the Honorable Douglas P. Woodlock, United States
3     District Judge, United States District Court, District of
4     Massachusetts, at the John J. Moakley United States Courthouse,
5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on
6     Monday, March 19, 2012):
7               THE CLERK:  All rise.
8          (The Honorable Court entered the courtroom at 2:30 p.m.)
9               THE CLERK:  You may be seated.
10              This is Criminal Action 09-10035, the United States
11    versus Shane Doyle.
12              THE COURT:  Well, I am a little perplexed, I guess, by
13    this case and the way in which it has developed.  Maybe I can
14    put it in a broader context in perhaps asking the Government to
15    explain to me why the company gets to plead to a misdemeanor
16    and the defendant here faces a felony.
17              MR. STERNBERG:  Thank you, your Honor.  Jeremy
18    Sternberg on behalf of the Government.
19              Your Honor, the trial in the main case began and there
20    were certain severance rulings and evidentiary rulings that
21    impaired the Government's ability to try what it felt would be
22    its best case, and the Government made decisions to dismiss the
23    case against the individuals and to accept a misdemeanor plea
24    from the company.  There are a host of reasons behind that.
25    The decisions to do that had nothing to do with Mr. Doyle's

1   case, had nothing to do with the high quality of the
2   cooperation that Mr. Doyle provided, and those decisions were
3   made certainly independent of his matter.
4            THE COURT:  I am not sure I would like to, but I will,
5   I suppose, if I have to, explore what a severance motion does
6   to a Government's case.
7            But I am asking a much more fundamental question,
8   which is, the company is engaged in a broad-based pattern and
9   practice and they end up with a misdemeanor and this defendant
10  ends up with a felony, and I do not understand why that would,
11  in a proportionate world, work.
12           MR. STERNBERG:  Well, the Government has certain
13  discretion to charge --
14           THE COURT:  It certainly does.
15           MR. STERNBERG:  -- in different ways.
16           THE COURT:  The question for me, I suppose, is whether
17  that discretion is being used fairly.
18           MR. STERNBERG:  Companies act in a variety of
19  different ways through a variety of different people, and were
20  it the case that the conduct by an employee, sales manager or
21  district manager could simply be imputed to the company for
22  criminal purposes, that's not the world that we live in.  A
23  company has to be tried on its own with --
24           THE COURT:  No doubt it does.
25           MR. STERNBERG:  -- admissible evidence against it.

1     THE COURT: No doubt it does. The question that I am
2 asking is a perhaps more fundamental question. Here it is
3 suggested that Mr. Doyle did it on behalf of the company, it is
4 not a rogue activity, and the company is responsible to some
5 degree. Now, the difference is that Mr. Doyle pled guilty
6 early on and the company was able to pay a 15-million-dollar
7 fine for a misdemeanor.
8     I did want to ask one question. Does the fine for a
9 misdemeanor go up to $15 million?
10     MR. STERNBERG: Misdemeanors are not mandatorily
11 governed by the *Sentencing Guidelines*.
12     THE COURT: Not even talking about the *Guidelines*.
13 So, you can get a 15-million-dollar misdemeanor?
14     MR. STERNBERG: Yes, your Honor.
15     THE COURT: It is within the scope of the statute?
16     MR. STERNBERG: Yes, under -- I believe it's -- if you
17 would give me a moment.
18     I believe the statute, the misdemeanor statute,
19 333(a)(1) -- I believe the relevant statute is 3571(d) or (e),
20 which provides for a fine that is up to twice the maximum gain
21 or loss.
22     THE COURT: Irrespective of whether it is a
23 misdemeanor?
24     MR. STERNBERG: I believe that's correct, your Honor.
25 To address the Court's more fundamental question about the

1  fairness --
2          THE COURT:  The misdemeanor for the resulting in death
3  is not more than $500,000; for a Class A misdemeanor it is
4  $200,000.  Then, if any person derives pecuniary gain from the
5  offense, or if the offense results in pecuniary loss to a
6  person, it is twice the gross gain and loss.
7          Now, a corporation is a person for these purposes?
8          MR. STERNBERG:  I believe so, your Honor.
9          THE COURT:  How is the calculation done?  Was there a
10 Presentence Report done?
11         MR. STERNBERG:  There was not.
12         THE COURT:  So, how is it that you got $7.5 million?
13         MR. STERNBERG:  It was less than $7.5 million -- sorry
14 -- more than $7.5 million.  The maximum fine is twice the gross
15 gain.
16         THE COURT:  Right.  So, it had to be not more than
17 $7.5 million.
18         MR. STERNBERG:  Right.  We used a different
19 multiplier, so the base number that was multiplied was more
20 than $7.5 million.
21         THE COURT:  Was that disclosed in some document to the
22 Court?
23         MR. STERNBERG:  I believe the Plea Agreement contains
24 the math on that.
25         THE COURT:  For the math.  The math imports values.

1   The values that were involved, that is the basis for saying
2   that $7.5 million of loss was -- more than $7.5 million is
3   disclosed in some document?
4           MR. STERNBERG:  I don't think so.  I don't think the
5   number of events of misbranding which are then multiplied by
6   the dollar amounts attributable to each event of misbranding, I
7   don't believe that that's in the Plea Agreement, and I don't
8   believe that's in any --
9           THE COURT:  Is there some basis for that, though,
10  internal, in a cross-memorandum or something like that?
11          MR. STERNBERG:  There was certainly a basis for it in
12  the dialogue between the parties.
13          THE COURT:  You mean a gestalt between the parties;
14  they were willing to pay $15 million and you were comfortable
15  saying it could have been as much as $7.5 million of loss?
16          Let me put it in a different sort of way.  You have
17  said with respect to Mr. Doyle that there were only two
18  occasions in which he provided written off-label advice.  Are
19  those the entire scope of the loss caused by Mr. Doyle?  That
20  is what you negotiated.  That is different from whether or not
21  that was, in fact, what was involved.  Only two occasions?
22          MR. STERNBERG:  The Government is aware of two
23  occasions of writings in which there are mixing instructions
24  for these two products.
25          THE COURT:  Are you aware of any other occasions in

1   which there were off-label instructions given that would be
2   used to constitute a loss involving Mr. Doyle?
3           MR. STERNBERG:  For the crime of misbranding so that
4   there were other writings?  No, we're not aware of other
5   written mixing instructions.
6           THE COURT:  So, it has to be written?
7           MR. STERNBERG:  The crime of misbranding involves
8   labeling --
9           THE COURT:  Right.
10          MR. STERNBERG:  -- and labeling is some form of
11  written material.
12          THE COURT:  So, only written instructions from a sales
13  manager could constitute misbranding?
14          MR. STERNBERG:  Well, the writings can be all sorts of
15  things.  They can be Power Point slides, they can be handouts.
16  They can be a whole variety of different writings.
17          THE COURT:  Right.
18          MR. STERNBERG:  From Mr. Doyle's perspective, the
19  Government's aware of these two writings.
20          THE COURT:  Well, I will put it in a different way.  A
21  company is engaged in $7.5 million worth of effectively
22  misbranding and they get a misdemeanor.  An individual is
23  engaged in two occasions, somewhere between $10,000 and
24  $30,000, and he gets a felony.
25          MR. STERNBERG:  The math certainly works that way.  As

1   I was saying before --
2   　　　　　THE COURT:  You mean the arithmetic works that way.
3   The math does not, and certainly the math in a larger sense
4   does not if we are talking about proportions.
5   　　　　　MR. STERNBERG:  Companies act through a variety of
6   different employees.
7   　　　　　THE COURT:  They do.
8   　　　　　Maybe I will be a little bit more forceful.  How can
9   you do it?  How can you do it?
10  　　　　　MR. STERNBERG:  At the Rule 11 hearing, and as part of
11  the Agreed Statement of Facts, the Government presented that
12  the company had provided Mr. Doyle with some training.  As I
13  was saying, the company acts through a variety of people.
14  There were certain people at the company who were diligent
15  about training the sales representatives and the sales force
16  about what they could and couldn't do.
17  　　　　　Your Honor mentioned earlier that Mr. Doyle was acting
18  on behalf of the company and was not a rogue employee.  I'm not
19  sure about that characterization, but Mr. Doyle was doing
20  things at the sales representative level, where he was employed
21  and where he was acting, that were contrary to written training
22  materials that the company had provided to him and contrary to
23  presentations on training materials that he had been given.
24  　　　　　THE COURT:  So, the company was not guilty?
25  　　　　　MR. STERNBERG:  Pardon?

1       THE COURT:  The company was not guilty?

2       MR. STERNBERG:  Well, as I say, the company is
3  comprised of lots of different people not all pulling their oar
4  in the same direction.

5       THE COURT:  If I were talking about comparative
6  punishments for this crime, however you say that the company
7  speaks with many tongues, I have Mr. Doyle here for $10,000 to
8  $30,000 and I have the company for $7.5 million potentially; I
9  have got a misdemeanor for one and a felony for another.  Now,
10 is that proportionate?

11      MR. STERNBERG:  It depends on how you view
12 proportionality.

13      THE COURT:  How do you define proportionate?  I
14 suppose I would define it in terms of fair, fair and equitable.
15 I suppose I would do that.  And I suppose it is true that the
16 Government has discretion whether or not to take a plea from
17 somebody who can pay $15 million for a misdemeanor and impose a
18 felony conviction on somebody else who cooperates but does not
19 have the $15 million to pay off.  I suppose I could do that; I
20 can say that is the Government's calculus.  I would hope that
21 my Government would not view that as a fair resolution.

22      But that is what it comes down to, basically a payoff.
23 We will buy ourselves out of a criminal case for
24 $15 million, but we want a misdemeanor because a misdemeanor
25 means that we will not be debarred.  That is why we want the

1  misdemeanor.  But another man who loses his civil rights
2  because of a felony, well, he does not have $15 million to
3  offer that kind of plea arrangement with the Government.
4          MR. STERNBERG:  Your Honor, the Government does not
5  view the situation as a payoff or a buyout.
6          THE COURT:  Apparently not, but the company must have.
7          MR. STERNBERG:  Well, I don't know what the company
8  views it as.
9          THE COURT:  I have to tell you, I do not understand
10 it, I really do not understand it, and I am not sure I want to
11 be part of it.  As a matter of fact, I am pretty sure I do not.
12         The Government can make its own deals on a case that
13 turns out not to be as strong as it thought it was, and a
14 company can make an arrangement, cost of doing business,
15 particularly if it means that you can continue to do business
16 because you have not been convicted of a felony.
17         But now we have someone who is cooperating.  Now,
18 maybe I evaluate it in certain ways, maybe I evaluate the
19 testimony in certain ways, but the Government has maintained
20 that the only relevant conduct here is two misbrandings, and
21 for two misbrandings it is a felony and for the company it is
22 not.  Maybe it is all relative bargaining power, just the
23 morals of the market price, what can you extract from one
24 person or one other party as opposed to another, but I do not
25 think so.

1       So, I guess I would like to have some better
2  understanding with great particularity about how the Government
3  justifies the difference in sentence of Mr. Doyle and the
4  company.  I will put to one side the dismissal of the
5  individuals after trial starts.
6       MR. STERNBERG:  The difference in sentence is, first
7  of all, if one looks at Mr. Doyle's conduct in and of itself,
8  that conduct, even one misbranding would and could justify a
9  felony conviction.
10      THE COURT:  Couldn't it for the company, too?
11      MR. STERNBERG:  It could.  It did not here, but it
12 certainly could.
13      THE COURT:  What do you mean, "It did not here"?
14      MR. STERNBERG:  It ended up not --
15      THE COURT:  What the Government decided to do is
16 ignore the difference in the amounts and say, We will take a
17 $15 million misdemeanor.  If I look at the conduct of Mr. Doyle
18 here, the generating figure is loss.  Is it $10,000 to $30,000?
19      MR. STERNBERG:  That's correct, your Honor.
20      THE COURT:  It is math or maybe it is arithmetic.  I
21 cannot do it quickly enough, but I suspect that that is rather
22 a small percentage of $7.5 million.
23      Now, I do not want to be a slave to mathematics and
24 say that necessarily the harm to the Government was whatever
25 order of magnitude, different on the part of the company, but

1   it is a pretty substantial difference here.  Nor do I want to
2   say that yesterday's bargain will become today's market price.
3   But I do have a responsibility, I think, to have fair and
4   proportionate sentencing and sentencing including what are the
5   consequences of sentencing, and the consequences of sentencing
6   for an individual, just like a corporation, are substantially
7   different between felony and misdemeanor.
8           MR. STERNBERG:  That is certainly true.  I think the
9   one aspect of it that the Court has been focusing on, the
10  exclusion of debarment, as the Court has described it, aspect,
11  can be the same, that one can be excluded or debarred for a
12  misdemeanor.  It is, depending on the crime, a much more, for
13  the agency's perspective, easy and often mandatory process for
14  a felony than it is for a misdemeanor, but there is permissive
15  exclusion --
16          THE COURT:  Is there going to be exclusion of the
17  company?
18          MR. STERNBERG:  There is not.
19          THE COURT:  So, they negotiated that as part of the
20  Plea Agreement?
21          MR. STERNBERG:  That's correct.
22          THE COURT:  Is this the justification?
23          MR. STERNBERG:  The justification for the charge
24  against Mr. Doyle is based on *his* conduct.  Whether or not the
25  company had been charged at all, whether the company had been

1   acquitted or whether the company had, as it did here, pled to a
2   misdemeanor, does not change Mr. Doyle's conduct when one
3   focuses on what he did.  Individuals are clearly different than
4   corporations.  Corporations can be punished in two primary
5   ways, money and then the consequences of the way they do
6   business: debarment, exclusion, probation and so on.
7           Here there is a different punishment the Government is
8   seeking.  There is a probationary sentence, a modest fine, and
9   the Government is seeking some form of home confinement.  To a
10  certain extent there is an apples-and-orange component to it,
11  and particularly with this statute, the Food, Drug and Cosmetic
12  Act and other kinds of cases, there are verdicts that have been
13  inconsistent:  corporation convicted, individuals acquitted.
14          THE COURT:  This is not verdicts that are
15  inconsistent.  This is the Government negotiating arrangements
16  between two entities, one an individual and one an
17  anthropomorphized individual that are so wildly inconsistent as
18  to give rise to a question about the integrity of the charging
19  decision.
20          The Government is not like everybody else making its
21  choices on the basis of convenience.  It has a larger
22  responsibility, so I am raising this issue.
23          I hear what you have to say.  I am not convinced and,
24  frankly, I need to know more.  So, I want briefing that tells
25  me the basis for the amount of loss imputed to the Government

1  without a Presentence Report, without, as near as I can find
2  out, any judicial review of this and why it is that that loss,
3  which to the Government is the same as a loss by the
4  individual, no different, should be treated as a misdemeanor as
5  opposed to a felony under some principled analysis other than
6  that is the best we could negotiate on a case that went south.
7      I really mean this.
8      Now, maybe there will be some reconsideration on the
9  part of the United States Attorney of whether it makes sense to
10 go forward on a felony under these circumstances.  Maybe it
11 will prove justifiable, or maybe not.  Maybe it will occur to
12 someone stepping back a bit that it would be a gross
13 miscarriage of justice to have the company walk away by paying
14 a lot of money with just a misdemeanor and leave in its wake
15 the persons who in the aggregate caused that loss that
16 generated only a misdemeanor to be stuck with a felony.
17     But before I am faced with the question of what to do
18 here, I want to learn a bit more about this.
19     I see references in the Sentencing Memorandum of the
20 defendant to difficulties the Government faced.  I am looking
21 at the case file somewhat from afar.  I do not see that that
22 was so disabling, severance.  "Severance" means that you did
23 not get to import into a case where it did not belong other bad
24 acts.  That is what it comes down to, if I generate from this
25 what was involved.

1   MR. STERNBERG: By when would the Court like the
2   briefing?
3   THE COURT: Two weeks. I want it to be detailed,
4   because otherwise I am going to say I want more briefing. I
5   want fully detailed briefing that explains to me why it is fair
6   and equitable to sentence Mr. Doyle to a felony when the
7   company has been sentenced to a misdemeanor in light of the
8   amounts of money involved respectively --
9   MR. STERNBERG: Understood.
10  THE COURT: -- and in the broadest possible sense.
11  So, that means, if that is sufficient time to think this
12  through --
13  MR. STERNBERG: Actually, your Honor, if we could have
14  another week, that would be useful, as I am going to be out the
15  entirety of next week.
16  THE COURT: Sure. That is fine. April 9th?
17  MR. STERNBERG: That would be fine.
18  THE COURT: And I trust, because I see in the
19  Presentence Report, that other individuals are facing
20  sentencing too in the next short period of time.
21  MR. STERNBERG: Yes. One is scheduled for April 4th,
22  one is scheduled for April 30th, and one is as yet unscheduled.
23  THE COURT: Well, I trust that until this is resolved
24  that you will bring to the attention of the sentencing Judge my
25  view that I am unwilling to sentence someone under these

1   circumstances until I have learned a great deal more, an
2   individual as against the corporation.
3             MR. STERNBERG:  Absolutely, your Honor.
4             THE COURT:  All right?
5             MR. STERNBERG:  Yes.
6             THE COURT:  So, we will continue this sentencing
7   hearing until we have some further information, unless there is
8   something else that you want to take up.
9             MR. STERNBERG:  Nothing from the Government, your
10  Honor.
11            THE COURT:  Anything from the defense?
12            MR. CIREL:  No, your Honor.  I don't understand that
13  you expect anything from us on that.
14            THE COURT:  You are free to make whatever comments you
15  want to make with respect to it.
16            MR. CIREL:  Thank you, Judge.
17            THE COURT:  I understand that the parties entered into
18  an agreement, it was an agreement that I found was knowing and
19  voluntary, but I am put in this awkward position of being asked
20  to impose a sentence which, on the basis of what I now know but
21  perhaps I will learn a good deal more, is unjust.
22            We will be in recess.
23            MR. CIREL:  Thank you, Judge.
24            THE CLERK:  All rise.
25         (The Honorable Court exited the courtroom at 3:00 p.m.)

1         (WHEREUPON, the proceedings adjourned at 3:00 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      C E R T I F I C A T E
2
3
4      I, Brenda K. Hancock, RMR, CRR and Official Reporter
5  of the United States District Court, do hereby certify that the
6  foregoing transcript constitutes, to the best of my skill and
7  ability, a true and accurate transcription of my stenotype
8  notes taken in the matter of *Unites States v. Shane Doyle*, No.
9  1:09-cr-10035-DPW-1.
10
11
12
13
14
15  Date: March 26, 2012          /s/ *Brenda K. Hancock*
16                                Brenda K. Hancock, RMR, CRR
17                                Official Court Reporter
18
19
20
21
22
23
24
25